AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Manuel Gomez-Sanchez | ) | Case No.  1:26-mj-00053  EPG |
| David Alejandro Sandoval Canales | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

**FILED**

May 12, 2026

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 24, 2026___ in the county of ___Kings___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Ct 1: 21 U.S.C. 841(a)(1) | Possession with the Intent to Distribute a Controlled Substance |
| | Minimum: 10 years' prison |
| | Maximum: Life |
| | $10,000,000 fine, 5 years supersvised release, $100 special fee |

This criminal complaint is based on these facts:

See affidavit of DEA Special Agent Jay D. Dial, Jr., in support of a criminal complaint, attached hereto and incorporated by reference.

☑ Continued on the attached sheet.

*Jay D. Dial, Jr.*
*Complainant's signature*

Jay D. Dial, Jr., DEA Special Agent
*Printed name and title*

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed. R. Crim P. 4.1 and 41(d)(3) before me this ___12___ day of May, 2026.

Date: **May 12, 2026**

*Erica P. Grosjean*
*Judge's signature*

City and state: ___Fresno, California___

Erica P. Grosjean, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff, | AFFIDAVIT OF DEA SPECIAL AGENT JAY D. DIAL JR |
| v. | |
| MANUEL GOMEZ-SANCHEZ, and DAVID ALEJANDRO SANDOVAL CANALES | |
| Defendants. | |

I, Jay D. Dial Jr., being duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

1.      Since May 2005, I have been employed as a Special Agent with the Drug Enforcement Administration, hereinafter referred to as the "DEA."   I am currently assigned to the DEA District Office in Fresno, California.  As a Special Agent, I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, various federal offenses.

2.      As part of my training with the DEA, I have successfully completed a sixteen-week DEA Basic Agent Training at the DEA Academy in Quantico, Virginia.  This training included instruction in the investigation of federal drug violations, including, but not limited to, Title 21, United States Code, Sections 841(a)(1) and 846.  I have also completed various other trainings provided by the DEA and local law enforcement agencies, including, but not limited to training on identifying characteristics associated with the manufacture, sale, and transportation of various narcotics, including, but not limited to phencyclidine (PCP), methamphetamine, heroin, cocaine, fentanyl, and marijuana.  This training involved the use, possession, packaging, sale, concealment, manufacturing, and transportation of various controlled substances as well as its precursors and chemicals used in the manufacturing process.

3.      During my time as a Special Agent with the DEA, I have participated in numerous

AFFIDAVIT

1

narcotics investigations either as a case agent or in a supporting role.  I have therefore conducted and been involved in numerous investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, §§ 841(a)(1), 841(c)(2), 843, and 846 and the State of California Health and Safety Code.  As part of these investigations, I have participated in many aspects of drug investigations including, but not limited to, undercover operations, conducting physical and electronic surveillance, and arrests.  I have also debriefed defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations.  Through these investigations, I have gained experience and knowledge with narcotics traffickers' methods of operation including the distribution, storage, manufacturing, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.

4.      This affidavit is made in support of a criminal complaint for Manuel GOMEZ-SANCHEZ (hereinafter, "GOMEZ-SANCHEZ") and David Alejandro Sandoval CANALES (hereinafter, "CANALES"), for violating Title 21, United States Code, Section 841(a)(1), possession with the intent to distribute Methamphetamine.

5.      The facts in the affidavit come from personal observations and training and, where noted, information related to me by other law enforcement officers and/or agents. Because this affidavit is written solely for the purpose of establishing probable cause for issuance of a criminal complaint, not all results of this investigation have been included herein.

## II.      PROBABLE CAUSE

6.      On Tuesday, March 24, 2026, at approximately 4:35 p.m., California Highway Patrol Officer Rodriguez was on routine patrol in a fully marked patrol vehicle. While traveling northbound on Interstate 5, Officer Rodriguez observed a black 2020 Chevrolet Traverse bearing California license plate 9UXX243 traveling ahead of him.

7.      Officer Rodriguez noticed that the Traverse was traveling ahead at a high rate of speed, which—based on his training and experience—Officer Rodriguez estimated to be approximately 80 miles per hour. The posted speed limit at that location was 70 miles per hour. Officer Rodriguez activated his patrol vehicle's front-facing radar unit. The radar unit produced a clear and consistent Doppler tone with

a reading of 76 miles per hour. Officer Rodriguez positioned his patrol vehicle behind the suspect vehicle, activated his forward emergency lights, and initiated a traffic stop of the Traverse.

8.    Officer Rodriguez approached the vehicle on the passenger side, contacted the driver, and advised the driver of the reason for the stop. The driver indicated he did not speak English, so Officer Rodriguez spoke to him in Spanish.

9.    The driver stated he did not possess a driver license and instead provided a Mexican passport. The passport identified the driver as Manuel GOMEZ-SANCHEZ. The passenger was later identified as David Alejandro Sandoval CANALES and was the registered owner of the vehicle.  Both GOMEZ-SANCHEZ and CANALES were asked to step out of the car.

10.    Officer Rodriguez asked CANALES whether he possessed any weapons. CANALES initially stated he did not. During a pat-down of his person, Officer Rodriguez manipulated CANALES's front-left shorts' pocket. As he did so, Officer Rodriguez felt a heavy metal object within. Officer Rodriguez glanced downward and observed the base of a firearm magazine. Officer Rodriguez again asked whether CANALES possessed a weapon, and CANALES admitted he did. The firearm was removed and determined to be a Berretta semiautomatic handgun with five rounds loaded in the magazine. Both GOMEZ-SANCHEZ and CANALES were detained.

11.    As Officer Rodriguez searched the vehicle, GOMEZ-SANCHEZ stated, "si traemos algo." Officer Rodriguez recognized this phrase to translate in the English language to: "we have something." When Officer Rodriguez inquired what they possessed, GOMEZ-SANCHEZ responded "traemos droga." Officer Rodriguez recognized this phrase to translate in the English language to: "we have drugs." GOMEZ-SANCHEZ clarified that the drugs were located inside a black backpack under the rear passenger seat.

12.    Officer Rodriguez retrieved the black backpack. Inside, he observed ten individually packaged sandwich bags containing one pound each of a crystal-like substance. Based on his training and experience, Officer Rodriguez recognized this crystalline substance to be consistent with methamphetamine. Also in the backpack, Officer Rodriguez located two notebooks, a box of ammunition, and a compact digital scale. A search of the rear storage area of the vehicle yielded a disassembled AR-15 style rifle.

13.    All narcotics, firearms, and associated evidence were turned over to agents with the Fresno County High Impact Investigation Team (HIIT).  HIIT Investigator Eddie Torres inventoried the items located during Officer Rodriguez's search of the Chevrolet Traverse, including ten (10) packages of presumptive methamphetamine weighing one pound each,  three (3) cellular phones, one (1) Berretta handgun loaded with five (5) live rounds in the magazine, one (1) AR-15 style rifle,  two (2) note pads, one (1) box of Range Dynamics full metal jacket 32 auto box containing 50 live rounds, and one (1) small digital scale.[1] Upon further inspection of the disassembled AR-15 style rifle, Investigator Torres observed that it was equipped with a small NOVSKE KX3 #3 "Flaming Pig" Flash Suppressor. Upon further inspection of the note pads, Inspector Torres observed that they contained information which he recognized based on his training and experience to be consistent with pay/owe ledgers related to narcotic sales and purchases.

14.    Investigator Torres took custody of GOMEZ-SANCHEZ and CANALES for further questioning at the Kings County Sheriff's Office. Investigator Torres interviewed GOMEZ-SANCHEZ and CANALES in the Spanish language.

**A.  March 24, 2026, Interview of GOMEZ-SANCHEZ**

15.     Investigator Torres provided GOMEZ-SANCHEZ his Miranda advisement using his department-issued Miranda Warning Card. GOMEZ-SANCHEZ stated he understood his rights and agreed to provide a statement.

16.    GOMEZ-SANCHEZ explained that on Monday, March 23, 2026, at approximately 4:00 p.m., he and CANALES drove from Medford, Oregon, to Los Angeles, California.  The pair agreed to travel to Los Angeles to purchase crystal methamphetamine and transport it back to Medford to sell to a white male known to GOMEZ-SANCHEZ as "Bratt."

17.    GOMEZ-SANCHEZ stated he communicates via telephone with an individual in Mexico to arrange narcotics transactions. He said the narcotics are typically picked up at a Home Depot in Los Angeles. GOMEZ-SANCHEZ was unable to provide the exact location of the Home Depot.

---

[1] On March 24, 2026, the suspected methamphetamine was presumptively tested, yielding a positive result for methamphetamine. Each plastic bag weighed approximately one pound, for a total of ten pounds.

AFFIDAVIT

4

18.     GOMEZ-SANCHEZ claimed ownership of two Android cellular phones located by Officer Rodriguez in the Chevrolet Traverse. GOMEZ-SANCHEZ agreed to show Investigator Torres the WhatsApp application he used to communicate with his narcotics supplier located in Michoacán, Mexico. Investigator Torres handed GOMEZ-SANCHEZ his cellular phone, and GOMEZ-SANCHEZ opened the WhatsApp application. GOMEZ-SANCHEZ identified a contact within the application as his narcotics supplier. With GOMEZ-SANCHEZ's verbal consent, Investigator Torres reviewed recent messages and observed multiple WhatsApp voice calls and several photographs depicting receipts of money transfers from the United States to Mexico.

19.     GOMEZ-SANCHEZ explained that when he and CANALES decide to purchase methamphetamine for resale, GOMEZ-SANCHEZ contacts his source to place the order. Once the quantity is agreed upon, the supplier arranges for the narcotics to be picked up at a Home Depot location in Los Angeles. GOMEZ-SANCHEZ further explained that when they do not have sufficient funds, the supplier will front them the narcotics, with payment to be made after the drugs are sold. GOMEZ-SANCHEZ stated he uses money transfer services to pay the supplier after the narcotics are sold.

20.     GOMEZ-SANCHEZ explained that on March 23, 2026, CANALES drove throughout the night from Medford and that they arrived in Los Angeles on Tuesday, March 24, 2026, at approximately 10 a.m. to 11 a.m. While enroute, GOMEZ-SANCHEZ contacted his source to notify him they were traveling to pick up the narcotics.

21.     Upon arrival at a Home Depot parking lot, a Hispanic male in his 30s or 40s approached their vehicle carrying a black backpack. The male entered the rear seat of the Chevrolet Traverse and delivered approximately ten pounds of methamphetamine. GOMEZ-SANCHEZ stated he and CANALES paid the male $700 per pound of methamphetamine, totaling $7,000 in cash. The male then exited the vehicle, leaving the backpack containing ten one-pound bags of methamphetamine.

22.     After obtaining the methamphetamine, GOMEZ-SANCHEZ drove northbound to deliver the narcotics in Medford, Oregon. GOMEZ-SANCHEZ stated that he and CANALES planned to sell the methamphetamine to "Bratt". GOMEZ-SANCHEZ explained they typically sell each pound for $900 to $1,000, generating a profit.

AFFIDAVIT

5

23. When asked about the AR-15-style rifle located in the rear compartment of the SUV, GOMEZ-SANCHEZ indicated that he and CANALES purchased the rifle in Medford for approximately $200 from an unknown seller. GOMEZ-SANCHEZ said the rifle had been concealed within a shirt in the rear tire compartment of the Chevrolet Traverse.

24. GOMEZ-SANCHEZ stated he does not know the identity of his source and has never met him in person. He explained that he and CANALES obtained the contact information while in Los Angeles searching for a narcotics supplier.

**B.      March 24, 2026, Interview of CANALES**

25. Investigator Torres thereafter interviewed CANALES. He provided CANALES with the Miranda advisement using his department-issued Miranda Warning Card. CANALES acknowledged that he understood each of his rights and agreed to provide a statement. The interview was recorded and later booked into the DOJ evidence vault.

26. CANALES stated he had recently been staying with GOMEZ-SANCHEZ in Los Banos, California, and had been traveling with GOMEZ-SANCHEZ to Oregon.

27. When asked if he knew why he was arrested, CANALES stated it was because the officers located approximately ten pounds of crystal methamphetamine during the traffic stop.

28. CANALES stated the black Chevrolet Traverse they were traveling in belonged to him and was registered in his name.

29. CANALES further explained that he and GOMEZ-SANCHEZ act as drug couriers and are typically paid between $500 and $600 per trip to transport methamphetamine from Los Angeles to Oregon.

30. According to CANALES, while in Oregon, GOMEZ-SANCHEZ communicated with an unknown individual and arranged for them to travel from Portland, Oregon, to Los Angeles to pick up narcotics. On Monday, March 23, 2026, at approximately 4:30 p.m., they departed Portland and drove southbound. CANALES stated they took turns driving and arrived in Los Angeles on Tuesday, March 24, 2026, between 6:00 a.m. and 7:00 a.m.

31. CANALES explained that at a shopping center in Los Angeles, a Hispanic male approached their vehicle carrying a black backpack. The male opened the rear door and placed the

AFFIDAVIT

6

backpack inside the vehicle. CANALES stated he looked inside the backpack and observed several clear plastic bags containing methamphetamine. He estimated the total weight to be approximately 10 pounds.

32. CANALES denied paying the Hispanic male adult for the narcotics. He stated that all arrangements are made in advance and that they are only responsible for transporting the narcotics to a designated location after pickup.

33. CANALES stated they recently began transporting narcotics and had completed approximately three deliveries, including one to San Francisco and one to Oregon. SANDOVAL CANALES denied knowing the identity of the individual GOMEZ-SANCHEZ communicates with to arrange narcotic transactions, but acknowledged knowing that they were transporting methamphetamine.

34. CANALES stated that GOMEZ-SANCHEZ was driving at the time of the traffic stop. During the stop, while retrieving the vehicle registration from the glove compartment, he observed a handgun. CANALES explained that the handgun did not belong to him and that he did not know who placed it in the vehicle. CANALES further stated that after the officer walked away upon being provided the vehicle registration, he removed the handgun from the glove compartment and placed it in his shorts front pocket in an attempt to conceal it.

35. CANALES stated he later consented to Officer Rodriguez searching his vehicle and acknowledged signing the consent search form.

36. After being asked to exit the vehicle and during a search of his person, CANALES acknowledged that the officer located the handgun in his pocket. CANALES stated the handgun contained a loaded magazine but did not have a round in the chamber.

37. When asked, CANALES denied any knowledge of the AR-15 style rifle located in the rear compartment of the Chevrolet Traverse.

38. CANALES told Investigator Torres one of the Android cellular phones seized during the traffic stop belonged to him and provided verbal consent for Investigator Torres to check his phone. Investigator Torres thereafter concluded the interview.

39. Based on the foregoing facts and circumstances, in conjunction with my training, experience, and discussions with other investigators, it is my opinion that GOMEZ-SANCHEZ and CANALES traveled to Los Angeles, California to obtain a ten pounds of methamphetamine and transport

AFFIDAVIT

the narcotics to Oregon for the purpose of distribution and sale, in violation of 21 U.S.C. § 841(a)(1). In forming this opinion, I found significant that both subjects admitted their involvement in coordinating the pickup and transportation of the methamphetamine, demonstrating a mutual agreement and shared intent to commit the offense. In addition to their statements, I also found significant the quantity of methamphetamine in this case, which I know based on my training, experience, and discussions with other investigators, to far exceed an amount that would be possessed for personal consumption. I also found significant that two notebooks containing pay-owe ledger information were located in the backpack with the packaged methamphetamine. I know based on my training and experience that drug traffickers commonly employ these pay-owe ledgers to maintain a balance of payments and to track the amount of narcotics purchased and sold between vendors and customers. I also found significant the presence of firearms in the Chevrolet Traverse. This is because I know that drug traffickers will commonly possess firearms to both protect the narcotics they possess and any monetary funds from potential rival traffickers.

### III.   CONCLUSION

40.   Based on the aforementioned facts and circumstances described in this Affidavit, it is my belief that there is probable cause to believe that Manuel GOMEZ-SANCHEZ and David Alejandro SANDOVAL CANALES are in violation of Title 21 U.S.C. § 841(a)(1). I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Jay D. Dial Jr., Special Agent
Drug Enforcement Administration, DEA

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone on

**May 12, 2026**

Hon. Erica P. Grosjean
United States Magistrate Judge

Reviewed as to form:

/s/ Nicholas Karp
Nicholas Karp
Assistant U.S. Attorney

AFFIDAVIT

8